## GROSCHKE v. ARMOUR FERTILIZER WORKS.

(Circuit Court of Appeals, Third Circuit. October 26, 1917.)

No. 2307.

**1. SALES 32—CONTRACT BY CORRESPONDENCE—MEETING OF MINDS.**

Correspondence between plaintiff and defendant concerning a sale of sulphate of ammonia, to be shipped from England to American ports, *held* to show no contract between the parties, because there had been no meeting of the minds respecting the length of notice to be given, when delivery was desired at certain ports to which there were no regular sailings.

**2. SALES 23(4)—OFFER TO BUY AND ACCEPTANCE.**

A broker, after negotiations with plaintiff and defendant respecting a sale of sulphate of ammonia, to be shipped to American ports, sent defendant a "buyer note" for execution, and to be then sent to plaintiff for acceptance; it being contemplated that the acceptance would be evidenced by the execution of a complementary writing in the form of a "seller note" embodying the same terms. The buyer note provided for delivery at "current Atlantic ports," and stated that the buyer was to declare port of arrival 30 days prior to shipment, except ports to which there were no regular sailings, where buyers were to give 60 days' notice. Before this buyer note, as executed by defendant, could have reached plaintiff, the broker wrote defendant, stating that plaintiff did not consider Wilmington, N. C., and Jacksonville, Fla., as current ports, and defendant promptly replied, declining to accept this interpretation of the contract, and stating that they could not permit these two ports to be left out of consideration. Defendant's reply reached the broker, and plaintiff was informed of defendant's position, before plaintiff's execution of the seller note. *Held*, that there was no complete contract, as the minds of the parties never met on the question of deliveries to difficult ports, especially where plaintiff, after the execution of the seller note, continued negotiations respecting deliveries to such ports.

In Error to the District Court of the United States for the District of New Jersey; Thos. G. Haight, Judge.

Suit by Emil F. Groschke against the Armour Fertilizer Works. Judgment for defendant, and plaintiff brings error. Affirmed.

Vredenburgh, Wall & Carey, of Jersey City, N. J. (Albert C. Wall, of Jersey City, N. J., and Herbert Barry, of New York City, of counsel), for plaintiff in error.

Hartshorne, Insley & Leake, of Jersey City, N. J. (Eugene W. Leake, of Jersey City, N. J., of counsel), for defendant in error.

WOOLLEY, Circuit Judge. This is an action on a written contract. The question involved is whether the trial court erred in directing a verdict for the defendant on the ground that the instruments sued upon do not constitute a contract between the parties.

Groschke, the plaintiff, was an exporter of sulphate of ammonia, residing in England.

Armour Fertilizer Works was a corporation, with headquarters in Chicago, engaged in the manufacture and sale of fertilizers, with factories or warehouses at points of distribution on the Atlantic seaboard, including Wilmington, North Carolina and Jacksonville, Florida. The character of its business was such as to require it to purchase raw

material from distant and widely separated parts of the world and to cause it to be assembled in this country at different times and places with an especial regard to the seasons and crops in which its finished products were intended to be used.

Goldsmith was a fertilizer broker with offices in New York. So far as the record shows, his relation to the parties was nothing more than that of broker, being without authority as agent to speak for or bind either one or the other. His business was to bring the buyer and seller together and to transmit from one to the other the terms and conditions upon which a contract of sale is negotiated and concluded. He therefore appears in this case simply as the medium by and through which one party communicated with the other.

The subject matter of the negotiations or of the contract was the purchase and sale of a large quantity of sulphate of ammonia, a costly ingredient used in the manufacture of commercial fertilizers, involving terms as to price, periods of shipment, points of delivery and notice as to deliveries. The negotiations covered correspondence extending through several months, culminating in the execution of buyer and seller notes, a form of contract familiar in that industry. Groschke, under his interpretation of the alleged contract, refused to promise deliveries at two particularly named ports, thereupon Armour, acting upon an opposite understanding, declined to accept deliveries elsewhere, and withdrew its offer or repudiated the contract.

The case is pleaded, first, upon a contract made by the parties by correspondence, and, second, upon a formal contract concluded by buyer and seller notes. The answer recites the circumstances upon which the defendant relies to sustain the defense that the minds of the parties never met.

At the trial, the District Court found that no contract had been entered into between the parties, and directed a verdict for the defendant.

On writ of error the case was argued from many angles according to the positions and points of vantage of the different parties, namely, that a contract was made and completed by correspondence, and that nothing remained to be done but to embody its terms in a formal instrument; or, if it be found that no contract was made by correspondence, then a formal contract was made by the execution of buyer and seller notes; that the precedent, concurrent and subsequent correspondence was erroneously admitted to vary the terms of the contract thus made; Gross v. Lord Nugent, 5 B. & Ad. 58; Wigmore's Pocket Code of Evidence, 2425; that a complete and binding contract may be made, although one or more of its terms be not definitely agreed upon, as in the Grumbling Assent Case, Joyce v. Swann, 17 C. B. (N. S.) 84; and that the parties had a different understanding of the terms, therefore, a mistake, not a contract, was made when the parties in using the same language meant different things. Raffles v. Wichelhaus, 2 Hurlstone & Coltman, 906; Stix v. Roulston, 88 Ga. 743, 748, 15 S. E. 826; Mummenhoff v. Randall, 19 Ind. App. 44, 49 N. E. 40; Strong v. Lane, 66 Minn. 94, 68 N. W. 765; Anson on Contracts, p. 156; Kerr on Mistake, p. 492; Williston on Sales, § 654; 9 Cyc. 245,

398.   Interesting as was the discussion of these propositions of law, yet as we view this case, there is but one matter submitted to us for decision, and that is, whether the minds of the parties met upon terms which were defined by the parties when they were expressed, and which did not involve a latent ambiguity in an essential term and a mutual misunderstanding of its meaning.   The question, therefore, is, —was there a contract between Groschke and Armour, made and completed by correspondence, or made by the exchange of formal buyer and seller notes?   The determination of this question requires a careful examination and a tedious recital of the correspondence of the parties.

Before pursuing this correspondence it is pertinent to note Groschke's attitude toward it.   Counsel for Groschke treats Armour's buyer note as an offer (as doubtless it was) and the execution of Groschke's seller note as an acceptance of the offer.   The buyer note was executed in Chicago, the seller note in England.   Counsel therefore treats the offer as accepted in England and the contract therefore as made in England, and from that position contends that being an English contract it is to be interpreted by the rules of the English law.   It is important to keep this position in mind, not as bearing upon a question whether English or American Law is applicable to this case or whether there is any difference between the laws of the two countries in requiring the minds of contracting parties to meet upon all terms before a contract is made, but as bearing upon the fact when, if ever, a contract was made, either by correspondence or by buyer and seller notes, and as bearing upon what intervened between the buyer's offer and the seller's acceptance in determining *as a fact* whether the minds of the parties ever met.

## (1) Contract by Correspondence.

[1] In reciting the correspondence of the parties, only matters material to the issue will be given.

February 18, 1914—Telegram, Armour to Goldsmith, wherein Armour offered to buy 3,500 tons of sulphate of ammonia "at $2.75 per hundred C I F *American ports New Orleans New York Range* option port to be declared *thirty days* in advance," guarantee as to percentage, etc.

This offer was not made to Groschke; it was made generally through Goldsmith to any seller he could procure.

February 19—Telegram, Goldsmith to Armour.   Goldsmith acknowledged Armour's offer, indicated its transmission abroad, and expressed a hope that it would lead to business.

February 19—Letter, Goldsmith to Armour.   Goldsmith confirmed the receipt and dispatch of the two last mentioned telegrams, but requested Armour to arrange "for more than thirty days' advance notice, for if the port should be a difficult one, like say Norfolk or *Wilmington,* to which there are *no regular sailings,* the shipments may require more than thirty days' notice."   Thus Goldsmith thought Wilmington, North Carolina, was included in "New Orleans New York Range."

February 20—Telegram, Goldsmith to Armour, stating that his foreign seller declined Armour's offer at $2.75, making counter-offer at $2.78, being silent on other terms.

February 20—Telegram, Armour to Goldsmith, wherein Armour directed Goldsmith to "book sulphate ammonia as per telegram February 18 at $2.78 * * * Please advise name of principal *Mail contracts*."

Armour thus accepted the new price and renewed his original offer of February 18th as to all other terms and conditions. These had not yet been accepted by the foreign seller.

February 20—Letter, Armour to Goldsmith, reciting and confirming exchange of wires of February 18, 20 and 20.

Up to this point the name of the foreign seller had not been disclosed, but at this point it appears that his name was desired and that formal contracts were requested by Armour.

February 21—Letter, Armour to Goldsmith, in reply to Goldsmith's request of February 19 that Armour arrange for more than thirty days' notice for deliveries at difficult ports. Armour said:

"Note your letter 19th in reference to sulphate of ammonia bid. In all probability we would want sulphate of ammonia shipped to New York, Baltimore, *Wilmington*, Savannah, *Jacksonville* and New Orleans."

From this it appears that Armour's understanding was that Wilmington and Jacksonville were within "New Orleans New York Range." Alluding to its option of ports as stated in its original and renewed offer to be declared thirty days in advance, Armour continued in this letter:

"In case of Wilmington and Jacksonville port, we no doubt could arrange to give you more than thirty days' notice, if necessary, and will do everything in our power to facilitate prompt handling of charters."

This is merely an indication that Armour was disposed to be accommodating in exercising its option to designate ports and in giving notice of deliveries. It does not amount to a withdrawal from or a change of its original offer of thirty days' notice.

February 21—Telegram, Goldsmith to Armour:

"Telegram received. Many thanks. My principal Mr. Groschke cables confirmation 3500 tons S/ammonia at $2.78 C I F *current Atlantic ports* including New Orleans with thirty days' notice prior to shipping month. Would like *sixty days*' notice to such ports where there are *no regular sailings Mailing contracts*."

An analysis of this telegram shows several things. It discloses Groschke as the seller. It confirms Armour's offer as to tonnage and price, introduces a new expression around which a controversy raged at the trial, namely "current Atlantic ports" for Armour's expression of "American ports New Orleans New York Range." It still left open the question of sixty days' notice of deliveries to ports to which there were no regular sailings (as Wilmington and Jacksonville); and lastly, it showed that Goldsmith was mailing contracts to Armour and mailing them at a time when no agreement had been reached as to sixty days' notice of deliveries to ports with non-regular sailings.

February 21—Telegram, Armour to Goldsmith, accepting sulphate

of ammonia at the price without naming any other conditions, and stipulating by a side contract participation in Goldsmith's commissions.

February 21—Letter, Goldsmith to Armour, confirming telegrams exchanged and extending congratulations upon the completion of the deal. In this letter Goldsmith said:

"My sellers would like to have sixty days' notice to such ports to which there are no regular sailings, as indicated in my Thursday's letter to you." (February 19.)

In such ports, as we have seen, Wilmington and Jacksonville were included. He also said:

"*I send you contract herewith covering the sale* and would thank you to kindly telegraph me on Monday that you are returning it with your acceptance so that I *can then mail duplicate to my sellers.*"

The "contract" mailed with the letter, the return of which was requested so that its duplicate could be mailed to the seller, was one end of the contract sued upon, namely the buyer note, in which there appeared the expression introduced into the transaction by Groschke "Current Atlantic ports including New Orleans, La." in lieu of the expression in Armour's offer—"American ports New Orleans New York Range." There also appeared for the *first time* a promise on the part of Armour to give sixty days' notice on difficult ports. It is in the following language:

"Buyers to declare port of arrival thirty days prior to the month during which shipment is to be made, except to such ports to which there are no regular sailings, where buyers are to give seller sixty days' notice."

The buyer note is one of two papers comprising the supposed formal contract. As the promise to give sixty days' notice of deliveries to difficult ports appeared for the first time in the buyer note, it follows that no such promise appeared in the antecedent correspondence. This was a material term of the proposed contract. It had never been agreed to by correspondence and therefore the parties had not reached the stage where their minds had fully met upon all terms of the proposed contract and where nothing remained to be done except to memorialize those terms by embodying them in a formal instrument. It is clear to us, for this reason if for no other, that no contract between the parties had been made by correspondence.

### (2) Contract by Buyer and Seller Notes.

[2] The plaintiff declared upon a contract by buyer and seller notes as well as upon a contract by correspondence. Having found that there was no contract by correspondence, the contract by buyer and seller notes, if any, is to be found within those two instruments. In such a transaction, as conceded by the plaintiff, the buyer note constitutes the offer, and the seller note constitutes the acceptance. Therefore, in searching for a contract within these two papers, we lay aside the correspondence leading up to the date of the buyer note and begin our inquiry upon its date.

Both buyer and seller notes bear date February 21, 1914. It is manifest that neither was executed on that date. The buyer note was not executed on February 21 by Armour in Chicago, because on that date it was mailed from New York by Goldsmith. Its receipt was acknowledged by Armour in a letter dated February 24, in which Armour stated that "conditions seem satisfactory." Its return was hastened by a telegram and letter from Goldsmith to Armour on February 25, in the former of which he said:

"I hope that you have mailed accepted S/A contract as am desirous *forwarding same to seller* without delay."

By letter of the same date (February 25) Armour returned its buyer note to Goldsmith.

From the sequence of this correspondence it appears that Armour's buyer note was executed on February 22, 23, 24 or 25. Being mailed from Chicago on February 25, it was presumably received in New York February 26 or 27. At all events, its receipt was acknowledged in a letter by Goldsmith to Armour, bearing date February 27, in which he said:

"1 am *forwarding* the same to my seller and will send you *his acceptance* as soon as received."

It is clear from this that the parties were giving to the buyer note the form of an offer made by the buyer, calling for acceptance by the seller. This theory of the transaction was carried into the trial of the plaintiff's case. When then did Groschke accept Armour's offer? He did not accept it until he performed some act with reference to it. Such an act may be his execution of the seller note or it may be the return of that note to the party offering, duly executed. Groschke signed the seller note upon some date. Upon what date did he sign it? Certainly not on the date it bore, February 21, for on that date the buyer note had just left New York for Chicago and had not been signed by the buyer. But Goldsmith had the buyer note in his hands on February 27. Assuming that he promptly mailed it to London on that date and that by the fastest mail it reached London in six days, Armour's buyer note did not reach Groschke until six days after February 27 at the very earliest, which was March 5. But before that date, Groschke began a new line of correspondence, as follows:

March 5—Letter, Goldsmith to Armour, stating that

"I am *today* in receipt of a *letter* from Mr. E. Groschke *confirming his acceptance* of your order for 3,500 tons sulphate of ammonia at $2.78 C I F current Atlantic ports, including New Orleans."

Goldsmith was quoting from a "letter" from Groschke, *that day* received (March 5). That letter could not have started from London any later than six days before March 5, which was February 27, at which time Armour's buyer note was still in Goldsmith's hands, and therefore had not reached Groschke. What acceptance did Groschke confirm by his letter? The transaction by correspondence? No, for the sixty days' notice of deliveries at difficult ports was still open and had not been agreed upon by correspondence. The acceptance of the contract tendered by Armour's buyer note? No, because that instru-

ment, not having left New York, certainly had not reached London. And furthermore, the acceptance of the formal buyer note contemplated an acceptance by executing a complementary writing in the form of a seller note embodying precisely the same terms. Groschke's seller note formally accepting the offer contained in the Armour buyer note was eventually returned to this country on March 20, as indicated by Goldsmith in a letter to Armour of that date. The letter containing Groschke's seller note therefore did not leave England before March 14. This being true, it is clear that the Armour buyer note, which counsel for Groschke terms an offer, did not reach Groschke until March 5 at the earliest and was not signed by Groschke until sometime between March 5 and March 14, and did not reach Goldsmith on its return until March 20. These dates are important, because by the letter received March 5 but written and mailed by Groschke to Goldsmith on February 27 or earlier, at a time before the Armour buyer note had been mailed from New York to London, Groschke was still negotiating with Armour as to terms of the proposed contract, as shown by Goldsmith's letter to Armour of March 5, wherein he stated that in a letter *that day* received from Groschke, "he (Groschke) pointed out that he does not consider Wilmington, N. C., and Jacksonville, Fla., as current ports. It goes without saying, however, that he will make shipment to these ports, *if freight opportunities offer."* With this understanding of Groschke conveyed to Armour before Armour's buyer note had reached Groschke, which was the opposite of what Armour had insisted upon all along, and with Groschke's seller note still unsigned so far as any evidence shows, and before it was mailed from London for return to Armour, Armour repudiated the understanding by letter to Goldsmith of March 9, saying:

"We must decline to accept this interpretation of the contract, as we cannot permit these two ports to be left out of consideration."

This declination by Armour to accept Groschke's interpretation of the proposed contract as to notice of deliveries to difficult ports was mailed at a time prior to Groschke's acceptance of the offer of the Armour buyer note, as shown not only by the dates and the periods of time necessarily required for transmission by mail, but by another sentence in Goldsmith's same letter of March 5, in which he says:

"In the meantime he (Groschke) will shortly receive my letter advising him that you have agreed to give him sixty days' notice to the difficult ports, and I therefore look for his prompt acceptance of the contract forwarded him. This I will send you as soon as it is received."

This statement of Goldsmith contained in the letter of March 5 clearly shows two things: first, that as Goldsmith understood the situation, the parties had not to that date agreed upon the matter of sixty days' notice, and also that the contract was to be closed by Groschke's formal acceptance of Armour's offer and its return to Armour.

Armour's letter to Goldsmith of March 9, declining to accept an interpretation that excluded Wilmington and Jacksonville from ports of delivery, having been delivered to Goldsmith before Groschke had accepted Armour's offer, Armour's position as disclosed by that

letter must be read into the offer of its buyer note. That Groschke had been informed of this position before he executed the seller note is shown by a letter from Goldsmith to Armour of March 23, in which Goldsmith states:

"Mr. Groschke is now in receipt of your advices contained in your letter of the *9th*, and therefore understands that Jacksonville and Wilmington will have to be included as current Atlantic ports."

Therefore, Armour interpreting its buyer note in one way and Groschke interpreting it in another way, followed promptly by the buyer's explanation of its terms and a repudiation of Groschke's interpretation, establishes the fact that the minds of the two never met by the buyer and seller notes upon the question of deliveries to difficult ports.

And so thought Groschke, because it appears by later correspondence that Groschke pursued negotiations as to terms respecting deliveries to difficult ports through the month of March and well into the month of April. The last of these negotiations before the final rupture appears in a telegram from Armour to Goldsmith, April 2, as follows:

"If you will get cable from Groschke by noon tomorrow in confirmation of our understanding that we demand delivery any port New Orleans New York range including Wilmington and Jacksonville we will accept."

By this telegram, Armour went back to the terms of its original offer of February 18, except as to price. Groschke's reply, as shown by telegram from Goldsmith to Armour of April 4, was an entirely novel proposition. It is as follows:

"Am pleased to advise have cable from Groschke reading 'propose execute Armour contract mutually agreed Wilmington Jacksonville *accessible while season.*'"

From this telegram, two things appear on the date of April 4th; first, that the contract had not been executed with Armour, and, second, that Goldsmith was authorized to execute it upon terms that deliveries should be made at Wilmington and Jacksonville if accessible while season (indicating a season when charters are readily procurable). Thus it appears that negotiations were still being conducted and that Groschke was still insisting upon terms different from those offered by Armour. The desultory correspondence that followed resulted in nothing. It is therefore clear to us that no contract was made between the parties either by correspondence before the buyer and seller notes were signed or by the buyer and seller notes when signed, and therefore the trial court committed no error in directing a verdict for the defendant.

The judgment below is affirmed.