W. S. H. ARMISTEAD, Appellant, v. TENNESSEE CONSOLIDATED COAL COMPANY et al., Appellees.

Middle Section. January 30, 1932.

Petition for Certiorari denied by Supreme Court, June 4, 1932.

Chas. C. Trabue, W. O. Vertrees and Cate & Cate, all of Nashville, for appellant, Armistead.

Lawrence Spears and Brown & Spurlock, all of Chattanooga, and Seth M. Walker, of Nashville, for appellee, Coal Co. et al.

CROWNOVER, J. This is a suit to recover $600,000 damages for the breach of an alleged contract for the sale of coal to be delivered f. o. b. cars at the Palmer Mines, in Grundy County, Tennessee.

The defendants demurred and then answered raising the defenses that the alleged contract was not completed: (1) There was no contract because there was no meeting of the minds of the parties, in that, Armistead had accepted a copy of the written offer in which "Clause 9," pertaining to strikes, lockouts, labor troubles, etc, had been omitted by oversight. (2) The offer contained alternative propositions as to the amount of coal to be sold, which contemplated an election, and Armistead failed to specify which amount he accepted. (3) Armistead failed to tender a $20,000 bond as a guaranty for the payment of shipments of coal within the time required in the option.

The bill of complainant, W. S. H. Armistead, alleged that the Tennessee Consolidated Coal Company, by its president, E. L. Hampton, executed to him an option to purchase coal to be delivered at the rate of 200 to 1000 tons per day for twelve months, the price to be $2.20 per ton f. o. b. at the Palmer Mines, which option was set out in the bill. The bill further alleged that during the negotiations and in the discussion of the terms and provisions of the proposed option a disagreement arose between them as to the insertion of a clause in regard to strikes and labor troubles, Hampton insisting on such a clause and Armistead opposing it, which clause is called in the record "Clause 9;" that the matter was compromised between them by the insertion of the last sentence in the option: "This proposition is subject to strikes and other labor troubles"; that he requested that two copies of said option or proposition be delivered to him, properly signed and executed, one addressed to "W. Davidson" and one unaddressed; that the white paper original copy was so addressed, with pen and ink, by Stanlee Hampton, son of defendant, E. L. Hampton, and it and one yellow paper carbon copy were delivered to him; Stanlee Hampton, while addressing the original, fraudulently inserted in it, after the last sentence, the following words: "as provided for in Clause 9 of the N., C. & St. L. Ry. contract above referred to"; that complainant knew nothing of the insertion of this clause into the original copy, addressed to W. Davidson, until June 23, 1922, as he put it away in his safe without inspecting it; that on May 20th he accepted the yellow carbon copy of the option, which had no such clause, and so notified the defendant Coal Company, which Company refused to deliver the coal, as the price of coal had greatly increased, and thereby breached the contract.

The defendants demurred to the bill. The grounds of the demurrer here relied on and necessary to be noticed are:

"(5) The proposition made by the defendant was to furnish 200 tons run of mine coal from the Palmer Mines, or 400, or 600, or 800, or 1000 tons daily for at least five days each

week for twelve months, and complainant failed in his acceptance to specify which quantity he would accept and there was therefore no meeting of the minds on either of the quantities as offered.

"(6) The defendant at the time of endorsing his acceptance on the said duplicate proposition in the presence of the officers of the Fourth-First National Bank, failed to make the $20,000 bond to be approved by them as stipulated in said proposition, and he failed therefore to comply with that condition of the option."

Defendant Hampton demurred on the ground that no cause of action was stated against him and he was an unnecessary party. The demurrers were overruled by the Chancellor, with leave to rely on the same defenses in their answers.

Thereafter defendants filed separate answers. The Tennessee Consolidated Coal Company answered that the parties had finally agreed that the clause in regard to "Clause 9" be incorporated in the option; that E. L. Hampton dictated the wording to his son in the presence of his wife and complainant Armistead; that Stanlee Hampton inserted it in the original option and one carbon copy, but through oversight failed to write it in the other carbon copy given to complainant; that E. L. Hampton, when he signed this carbon, believed that it contained the clause; that the proposition made by defendant Coal Company contained this "Clause 9."

The answer further alleged that complainant's endorsement of his acceptance on the duplicate in his possession did not create any contract between the Coal Company and complainant, for many reasons therein set out, not necessary to here notice, other than those relied on in this court, viz.: (1) Because the complainant accepted the carbon copy of the option that did not contain "Clause 9," which did not constitute an acceptance of the offer actually made by the Coal Company, and therefore there was no meeting of the minds of the parties. (2) The option contained five alternative propositions, in that, it provided that the Coal Company would agree to furnish "200 tons run of the mine coal from our Palmer Mines, or any multiple thereof up to 1000 tons daily" for twelve months, and the complainant failed to designate which he accepted. (3) Complainant having failed to execute and deliver the $20,000 bond to guarantee the payment within the time required, there was no valid acceptance of the option.

The defendant, Hampton, answered and admitted that he had authority to make the option and denied liability as he was only a nominal party.

The case was tried by the Chancellor on oral testimony, by agreement, in accordance with chapter 119 of the Acts of 1917, after de-

mand for a jury had been made by complainant, and waived by all the parties.

Complainant filed an amended and supplemental bill, setting out the substance of the original bill, and pleaded estoppel to deny the contract, and charged that if Hampton was not authorized to sign the option he was personally liable.

The Chancellor found that the offer as made by the defendant as shown by the original white paper copy addressed to W. Davidson in the possession of the complainant, and the carbon yellow paper copy in possession of the defendant, was the proposal actually made by the defendant, and that the other carbon or yellow paper copy which contained no reference to "Clause 9" of the N., C. & St. L. contract was the proposition accepted by the complainant, and that, therefore, there was no meeting of the minds of the parties, and hence no contract. The Chancellor decreed that the grounds of the demurrers filed by defendants and relied upon in their answers be overruled, and that the allegations in the original bill as to the entering into the contract having been fully met and denied by the answer, and not sustained by the proof, complainant's bill and amended bill be dismissed. Complainant and defendants excepted.

Motions for new trials having been overruled, both complainant and defendants have appealed to this court.

Complainant assigned errors which raise two propositions, as follows:

(1) The Chancellor erred in holding that there was no meeting of minds of the parties as to the contract, and that the offer made by the defendants was that set out in the original W. Davidson copy containing Clause 9 of the N., C. & St. L. Ry. Contract.

(2) The Chancellor erred in not holding that the silence, acts and admissions of defendants subsequent to May 20, 1922, estopped them from denying the acceptance of the contract, and amounted to a ratification of the same.

Defendant Coal Company assigned errors, which are, in substance, that the Chancellor erred in overruling defendant's demurrer because:

(1) Defendant Coal Company's offer contained five alternative propositions, and complainant failed to designate which, or what quantity of coal, he would accept, therefore there was no valid acceptance of the option.

(2) Complainant having failed to execute and deliver to defendants the $20,000 bond within the time required, there was no valid acceptance of the option.

E. L. Hampton assigned that the Chancellor erred in not sustaining his demurrer to the bill because he was not a party to the con-

tract sued on, and no cause of action was stated against him in said bill.

The Tennessee Consolidated Coal Company, by its president, E. L. Hampton, and W. S. H. Armistead entered into negotiations in regard to an option for the purchase of coal, at the office of Armistead in the Stahlman Building, Nashville, on the morning of May 2, 1922. Armistead wished an option on a portion of the output of the Palmer Mines. Palmer is a mining town in Grundy County, Tennessee, on a branch line of the N., C. & St. L. Railway. After some discussion they decided to meet in the afternoon at the Maxwell House in Nashville to go into the matter further. Stanlee Hampton, son of E. L. Hampton, and who was associated with him in business, also attended this conference. During this session the three of them drew up a tentative offer or proposition for the Coal Company which was dictated by them to a public stenographer. The proposition was typewritten, one original on white paper and two carbon copies on yellow paper. This proposition or offer was not addressed to any one, but simply headed ''Dear Sir.''

There had been much discussion about inserting in the option a clause with respect to strikes and labor troubles.

Prior thereto, and on March 14, 1922, the Coal Company had entered into a written contract with the N., C. & St. L. Railway Company for sale of coal from the Palmer Mines.

The Hamptons insisted on inserting a clause, referred to by them as ''Clause 9 of the N., C. & St. L. Ry. contract,'' protecting the coal Company in case of strikes, lockouts, car shortage, etc., and also on making this contract or option subordinate to the N., C. & St. L. contract, to which Armistead would not agree, stating that he had not seen the N., C. & St. L. contract and did not know the wording of Clause 9. Finally the following sentence: ''This proposition is subject to strikes and other labor troubles,'' was inserted into the option and copies.

A cancellation clause was then agreed upon, which E. L. Hampton wrote in his own handwriting on his copy and the stenographer typewrote as a postscript to the original and other carbon copy.

The offer or option, as then written, was as follows:

''Tracy City, Tenn., May 2, 1922.

''Dear Sir:

''For value received we hereby agree to the following and do make the same as a proposition unto you, with the understanding that this proposition is to be assignable by you.

''This proposition to be in force during and until the 20th day of May, 1922, and if not accepted by you, or your assigns by that date or $500 paid at that time, this option will be void,

but if $500 be paid on that date by you, or your assigns, then this proposition is to remain open during and until June 2, 1922.

"We agree and bind ourselves to furnish you or your assigns 200 tons Run of Mine Coal from our Palmer Mines, or any multiple thereof up to 1000 tons daily, for at least five days each and every consecutive week for twelve months from date of commencement of shipments, and we further agree that we will without extra charge prepare as, and when you may desire said Run of Mine coal, but the preparation to be limited to two sizes, but not below four inches. Shipments to commence, should you desire on, or after June 1, 1922, provided, our mines are at full operation at that time as they are now shut down on account of strike. The price for this coal shall be $2.20 per ton F. O. B. cars at Palmer Mines and railroad rates at nearest shipping points shall govern all shipments.

"We do hereby stipulate that Weekly settlements shall be made for all coal shipped, and that a bond of $20,000 (same to be approved by Fourth-First National Bank, Nashville, Tenn.) is to be made and furnished us to be as a guarantee and surety for the payment of the maximum amount of one week coal tonnage, and a satisfactory guarantee as to payment for further shipments.

"This proposition carries the same provision about the cleanliness, etc., of the coal as is stated and provided, in the coal contract. (with special reference to Palmer coal of date March 14, 1922, between this company and the Nashville, Chattanooga and St. Louis, Rwy.). This proposition is subject to strikes and other labor troubles.

"Yours truly,
"Tennessee Consolidated Coal Company,

_____
"President.

"P. S.—

"For mutual advantage, it is hereby proposed by us that you or your assigns may cancel the agreement based on the above proposition if same is previously accepted by you or your assigns at the end of any three or four months period, during the life of said twelve months contract.

"Tennessee Consolidated Coal Company,

_____
"President."

Armistead testified that he suggested that three copies of the option be made, as he wanted one to be addressed in blank so that he might insert his own name therein, or some other name, as he might desire.

As E. L. Hampton had not agreed to leave "Clause 9" out of the contract, the parties adjourned their conference that night from the Maxwell House to the home of Hampton, in Nashville. There the discussion of "Clause 9" was resumed. In the meantime Hampton had procured the N., C. & St. L. contract. "Clause 9" is as follows:

"It is understood and agreed that strikes, lockouts, wrecks, washouts, shortage of railroad cars, exhaustion of coal, or other casualties or contingencies beyond the control of either party shall be sufficient excuse for failure to fully comply with this agreement during the existence of such conditions, and upon abatement of such conditions deliveries shall be immediately resumed."

Hampton agreed not to insist on the subordination of the contract to the N., C. & St. L. contract, but did not agree that "Clause 9" should not be inserted. Throughout the discussion E. L. Hampton repeatedly stated that he would not give an option unless his Company was given the protection afforded by this "Clause 9." Armistead had stated that he would never accept an option containing a similar clause. Finally E. L. Hampton instructed his son, Stanlee Hampton, in the presence of his wife, Mrs. E. L. Hampton, and Armistead, to insert with pen and ink into the option and copies, just after "labor troubles," the words, "as provided for in clause nine of the N., C. & St. L. Ry. contract above referred to," making the last sentence read:

"This proposition is subject to strikes and other labor troubles, as provided in Clause '9' of N., C. & St. L. Ry. contract above referred to."

Stanlee Hampton went over to a desk in the same room, four or five feet away from Armistead, and with pen and ink inserted this language in the first or white paper copy and in one of the carbon or yellow paper copies, but through oversight he failed to insert this language in the second carbon or yellow paper copy, held by Armistead.

Aristead requested that the white or original copy be addressed to W. Davidson. Stanlee Hampton wrote with pen and ink the name "W. Davidson" just above "Dear Sir" on the original.

When Armistead asked that one copy be addressed to W. Davidson, he explained that it would be the same as if addressed to him as he would control the contract if there was an acceptance of said offer. It afterwards developed that W. Davidson was Armistead's negro chauffeur. Armistead had adopted this method for protection from his creditors, as he was insolvent, but he later abandoned this idea and undertook to accept the offer in his own name.

E. L. Hampton wrote the word "duplicate" on the second page of Armistead's carbon copy.

E. L. Hampton then signed his name as president of the Coal Company, on the blank lines left for his signature, upon the original or white paper copy and upon one of the carbon or yellow paper copies and gave both to Armistead. The other carbon or yellow paper copy, unsigned, was retained by Hampton.

The yellow carbon copy, unaddressed, delivered to Armistead, was the copy in which Stanlee Hampton had failed to insert the reference to "Clause 9" of the railroad contract. This omission was not noticed by E. L. Hampton.

On May 20, 1922, the last day on which this option could be accepted, Armistead went to the Fourth & First National Bank and in the presence of C. H. Litterer wrote on the yellow carbon copy retained by him: "I accept the above proposition. W. S. H. Armistead. This May 20/22." C. H. Litterer signed it as a witness. Armistead then had the president of the bank to wire notice of his acceptance and $500 to the Tennessee Consolidated Coal Company at Tracy City. On the night of the same day Mr. Armistead, accompanied by Mr. T. A. Clarkson, an official of the N., C. & St. L. Ry., went to the home of E. L. Hampton, who was away at the time, and placed a written notice of his acceptance on Hampton's door, and waited across the street until Hampton returned home and watched him until he received and read the acceptance just before twelve o'clock midnight.

The Coal Company refused to accept the $500, and answered that the officials of the Company were out of the City and it was unauthorized to accept the money.

On Monday, May 22nd, Hampton and his attorney, Col. W. D. Spears, who has since died, requested Armistead to meet them at the Hermitage Hotel. At which time they asked Armistead to indicate what his acceptance meant, what tonnage he had accepted,—whether 200, 400, 600, 800, or 1000 tons a day, but Armistead refused to specify what tonnage he would take. He offered Armistead a substitute contract, which he rejected. Hampton, on May 31, 1922, attempted to have Armistead add to this carbon copy the language in regard to "Clause 9" that had been by oversight omitted from it, which he refused to do.

On May 31, 1922, Armistead requested Hampton to sign an endorsement that he had written on the back of the yellow carbon copy, as follows: "To W. S. H. Armistead: This proposition is made to you or your assigns." But Hampton refused to sign it. He also wanted him to sign a letter addressed to himself (Armistead), stating that Armistead might file the $20,000 bond just before the

Coal Company began shipping the coal, which letter Hampton declined to sign.

On May 31, 1922, Hampton made an offer to Armistead that he would release a second mortgage held on his home if he would surrender up the option, which Armistead rejected.

On June 1st Armistead wired the Tennessee Consolidated Coal Company at Tracy City, Tennessee, that he would later give shipping instructions for coal and asked that it notify him before the Palmer Mines started operations. On June 24th or 25th he received a letter, Dated June 23, 1922, from the Coal Company, denying that it had any contract with him, which letter is as follows:

"June 23, 1922.

"Mr. W. S. H. Armistead.
"304 Stahlman Bldg.
"Nashville, Tenn.
"Dear Sir:

"Yours of June 1st was duly received.

"We do not consider that either that notice, or the one dated May 20th, 1922, and addressed to Mr. E. L. Hampton was an acceptance by W. Davidson of the proposition addressed to him on May 2nd, 1922, or that it was such acceptance as its terms required. If we had received either of the notices within the time required, which we deny, and if the bond for which we stipulated had been delivered, the quantity of coal to be furnished and the time of its delivery was too indefinite for fulfillment. We have heard nothing from Mr. Davidson to whom the proposition was made.

"In your last notice you ask that we write you at Nashville before the Palmer mines start operations so you could act according to requirements of the proposition. It was not contemplated that anything was to be left undone if the proposition had been accepted. We deny the existence of any contract with you for the shipment of any of the several quantities of coal as stated in our said proposal resulting from either of the acceptances referred to.

"It seems that the coal strike will continue for some time to come, and a vote is being taken whether the railroad employees will strike on account of a reduction in their wages; and it is also possible that the right of contracting will be to some extent regulated by the U. S. Government. Subject to these contingencies, that is, being prevented from complying by either of said strikes, or legal regulation, we will enter into a contract with you or Mr. Davidson to furnish you two hundred (200) ton of Run-of-mine coal from our Palmer mines for at least five days each and every consecutive week for three or four

months from date of commencement of shipments (which would be when our mines at Palmer resume full operations) at the price of $2.20 per ton f. o. b. cars at Palmer mines and subject to all other provisions as contained in our former proposition May 2, 1922.

"If you desire to enter into such contract, give us notice as soon as possible after receipt of this letter, say not later than five days, as it is necessary that we should be engaging our out-put for the coming season and know what we are to deliver when operations at our mines are resumed.

"Yours truly,

"Tennessee Consolidated Coal Company,

"By E. L. Hampton, Pt."

On October 10, 1922, Armistead sent the Company his bond for $20,000 and requested shipments of coal at the rate of 1000 tons per day. The bond was returned by the Company and no shipments made.

At the time of the negotiations on May 2, 1922, the mines of the Tennessee Consolidated Coal Company at Palmer, Tennessee, were closed down on account of a labor strike, and had been closed since April 1, 1922. During the months of September, October, November and December, 1921, and until May, 1922, a nation-wide strike of railway employees was about to take place. In May, 1922, an application to reduce the wages of railway employees was pending before the Labor Board. Such employees were threatening to strike if the Labor Board reduced their wages. The Labor Board did not decide the question of wage reduction until June, 1922. On July 10, 1922, as had been anticipated, there was a strike of railroad employees, including employees of the N., C. & St. L. Railway, which caused a shortage of cars.

1. We are of the opinion that the complainant's first assignment of error, to the effect that the Chancellor erred in holding that there was no meeting of minds of the parties as to the contract and that the offer made by the defendants was that set out in the original W. Davidson copy containing "Clause 9" of the N., C. & St. L. Ry. contract, is not well made and must be overruled.

It appears from the testimony that E. L. Hampton would not sign the option without the insertion of the clause "as provided in Clause '9' of the N., C. & St. L. Ry. contract above referred to" and that he had stated this repeatedly, and in the presence of Armistead he directed his son to insert this clause, which was done in the immediate presence of Armistead. All these things could not have been done without Armistead's knowledge, hence the only proposition that the defendant Coal Company made was the one in-

cluding that clause. That clause was left out of the carbon copy by oversight, and Armistead attempted to accept the offer set out in that copy. It results that he did not accept the proposition as made and there was no meeting of the minds of the parties, unless the insertion of that clause did not add anything to the contract. Conditions in an acceptance which do not qualify in legal effect the offer, do not impair the acceptance. 1 Williston on Contracts, sec. 78; 55 C. J., 102-3; Columbia Malting Co. v. Clausen-Flanagan Corporation, 3 Fed. (2d), 549.

It is vehemently insisted by appellant that the insertion of this clause did not add to or take from the contract in any manner and therefore the matter may be disregarded. We cannot assent to this proposition. The clause, ''this proposition is subject to strikes and other labor troubles,'' without more, is uncertain, and there may be some doubt as to the extent of its meaning, which would require parol proof. The clause without more would refer only to strikes and labor troubles of the contracting parties and not to strikes of the railroad. The shortage of cars due to a railroad strike would not be covered by that clause. Consolidated Coal Co. v. Jones & Adams Co., 232 Ill., 326, 83 N. E., 857. Whereas Clause 9 of the N., C. & St. L. Ry. contract is not uncertain and there is no doubt as to its meaning. The coal was to be delivered f. o. b. cars at the Palmer Mines. If the Coal Company could obtain no cars to load, of course it could not deliver the coal f. o. b. cars at the Palmer Mines, and therefore it could not carry out the contract. A shortage of railroad cars is often caused by strikes and other labor troubles of the railroad; hence the insertion of the controverted clause would provide for such contingencies not otherwise covered, and would prevent serious controversies and litigation.

All of these parties were experienced coal men and knew whether the insertion of the clause, ''as provided in Clause 9 of the N. C. & St. L. Ry. contract above referred to,'' would affect the rights of the parties. Hampton strenuously insisted that he would not and did not make any proposition without the insertion of that clause, while on the other hand Armistead insisted that he would not have accepted the proposition containing that clause and that Hampton's son fraudulently and surreptitiously inserted the clause without his knowledge and consent; hence it appears that the parties placed great importance on the insertion of that clause, to the extent that if they were sincere in their contentions it was an insurmountable obstacle to the execution of the contract. It seems clear that if before a contract is finally concluded the parties become aware that they are insisting upon different constructions of their duties thereunder no contract will arise. 1 Williston on Contracts, 138, sec.

78; Groschke v. Armour Fertilizer Works, 245 Fed., 513; Canton Cotton Mills v. Overall Co., 149 Tenn., 23, 30, 257 S. W., 398.

It appears that Hampton stated and thought that the clause covered all contingencies set out in "Clause 9" of the Railway contract and that Armistead concurred therein as he stated that he would never have accepted the proposition with that clause in it.

In the case of Canton Cotton Mills v. Overall Co., supra, taking the language used by the parties in its ordinary everyday meaning, there was a plain offer and acceptance, but it appears that the parties by their dealing did not consider the deal as closed, and the court held that the construction of the contract would be given that placed upon it by the parties themselves.

It follows then that where the parties thought that they had included the clause but the same had been left out by oversight we must take the option as if it contained the clause. Where a clause has been agreed upon but is left out of a contract by oversight it may be inserted in equity. First National Bank v. Ashby, 2 Tenn. App., 666.

We hold that this clause was a material part of the option, and was a part of the defendant Coal Company's proposition, and when the complainant accepted the written copy that did not contain the clause it was in effect the making of another proposition. Qualified or conditional acceptances are in effect counter offers and reject the original offer. 13 C. J., 281; 55 C. J., 98, sec. 62; 6 R. C. L., 608; 1 Williston on Contracts, 134, sec. 77; Minneapolis & St. Louis Ry. Co. v. Columbus Rolling Mill Company, 119 U. S., 149, 30 L. Ed., 376; Columbia Malting Co. v. Clausen-Flanagan Corporation, supra; Canton Cotton Mills v. Overall Co., supra.

It is equivalent to an absolute rejection of the offer, and puts an end to negotiations on such offer unless renewed or waived by the offerer. 55 C. J., 101-2, sec. 63.

A party making an offer is not bound where the other party makes a counter offer even though that party states: "We have therefore entered the contract accordingly and await your further commands." Columbia Malting Co. v. Clausen-Flanagan Corporation, supra; Canton Cotton Mills v. Southwest Overall Co., 8 Fed. (2d), 807; Saco-Lowell Shops v. Clinton Mills Co., 277 Fed., 349.

The acceptance must be identical with the offer. Detroit Copper & Brass Rolling Mills v. Wise, 297 Fed., 460.

It is insisted by complainant Armistead that he never agreed to the insertion of that clause and that the same was fraudulently inserted by Stanlee Hampton without his knowledge, and therefore when he accepted the yellow carbon copy there was a valid contract.

The burden is on the complainant to prove the contract as alleged. Pigg v. Houston & Liggett, 8 Tenn. App., 613. The evidence greatly preponderates against his contentions; therefore, the assignments of errors on these propositions must be overruled.

2. The complainant's second assignment of error, to the effect that the Chancellor erred in not holding that the silence, acts and admissions of defendants subsequent to May 20, 1922, amounted to a ratification of the contract and estopped them to deny the acceptance of the contract, is not well made and should be overruled, as defendants did nothing to ratify the contract and said nothing to estop themselves.

The parties had considerable negotiations after May 20, 1922, each trying to get the other to agree to different propositions, but without results. Hampton asked Armistead to insert "Clause 9" in the carbon copy, which Armistead refused. Armistead asked Hampton to write on the back of the option that the proposition was made to Armistead or his assigns, which Hampton refused to do. Hampton asked Armistead to elect which proposition he accepted and to specify the number of tons he desired, and even asked Armistead to sign a new contract. All of which Armistead refused, because "it was as full of tricks as a dog's back was of fleas." Armistead asked Hampton to sign a paper requesting a postponement of shipping orders and agreeing to a postponement of the execution and delivery of the $20,000 bond until shipments began, which Hampton refused. Armistead obtained a different classification and rate on the coal from the railroad, which Hampton resented. The Coal Company's employees at Tracy City refused to accept notice of the acceptance of the option and to receive the $500 deposit on May 20, 1922, and Armistead delivered written notice at Hampton's home and watched the house until midnight to see that Hampton read it. Armistead said that he thought Hampton would try to evade the contract. Under such circumstances as these it is hard to see how Armistead was led on to his injury, and we do not think the defendants did or said anything that Armistead could reasonably construe to be a ratification of the contract or to estop them from denying liability. Mere silence and inaction cannot be construed as an assent to the offer. Columbia Malting Co. v. Clausen-Flanagan Corporation, supra; 1 Williston on Contracts, sec. 91; 13 C. J., 276.

It is insisted by Armistead that as the defendant Coal Company had stated in its letter of June 23rd, in which it repudiated the contract, that it only made an offer to W. Davidson and therefore had no contract with complainant, it was estopped to set up other defenses in this suit. This contention is not well made for the reason that a party is not estopped to set up other defenses than those given to complainant before the suit is brought. See Canton Cotton

Mills v. Overall Company, supra; Real Estate Co. v. Kyoleum Co., 142 Tenn., 295, 303, 218 S. W., 821.

It results that all the assignments of errors on this proposition must be overruled.

Having overruled all of appellant's assignments of errors, the defendants' assignments become immaterial, but as the case may be carried to the Supreme Court we will pass upon the defendants' assignments.

3. We are of the opinion that the defendant Coal Company's assignment of error that the Chancellor erred in overruling its demurrer, because the Coal Company's offer contained alternative propositions, which contemplated an election, and complainant Armistead failed to specify which he accepted, therefore there was no valid acceptance of the option, is well made and must be sustained. The clause of the Coal Company's proposition was: "We agree and bind ourselves to furnish you or your assigns 200 tons Run of mine coal from our Palmer Mines, or any multiple thereof up to 1000 tons daily, for at least five days each and every consecutive week for twelve months from date of commencement of shipments." We think this offer was made in the alternative. Such offers should be construed like other contracts—according to the intention of the parties as expressed in the contract. The circumstances under which the contract was made, the dealings of the parties, and their situation, as well as the subject matter of the contract should be considered in construing such clauses. Southern Publishing Association v. Clements Paper Co., 139 Tenn., 429, 201 S. W., 745. Complainant had no established business which would fix his requirements under the contract. He was a dealer in coal, selling as much or as little as his interests might require. The defendant Coal Company was operating a mine requiring the placing in advance of its orders so that the requisite number of miners might be employed and a sufficient number of cars provided to deliver the coal sold by it. Its situation demanded that it should know in advance the quantity of coal it was obligated to deliver each day. According to complainant's contention he could elect to take either 200, 400, 600, 800, or 1000 tons each day during the life of the contract, and his election would depend on whether it was to his advantage to take either one or the other of the five alternatives. If the market price happened to be above the contract price, he could elect to take 1000 tons, but if below he then could take as little as 200 tons. The Palmer Mines are situated out on the mountain away from any town, and it is necessary for the defendant Coal Company to employ as many miners as necessary to dig the coal and to build and to furnish houses for them and their families, and to furnish them food and clothing while employed. It would take five times as many miners to dig and

deliver 1000 tons of coal f. o. b. cars at the mines each day as it would take to dig and deliver 200 tons each day, therefore it would take five times as many houses and a great deal more expense to provide miners sufficient to dig and deliver 1000 tons per day than it would to dig and deliver 200 tons per day, and these miners must be provided for while employed whether 1000 tons per day were ordered or 200 tons per day were ordered. Hence, we think that it was within the contemplation of the parties that one of these alternative propositions should be accepted and the amount of coal designated on May 20, 1922.

Of course, an offer fixing a minimum and maximum, as fifteen to twenty car loads as may be necessary for the purchaser to operate his plant, or as required, accepted by the other party, constitutes a valid contract. Southern Publishing Asso. v. Clements Paper Co., supra; Crystal Paper Co. v. Robertson Co., 289 Fed., 15; Keystone Steel & Wire Co. v. Kokomo Steel & Wire Co., 1 Fed. (2d), 790; Consolidated Coal Co. v. Jones & Adams Co., supra.

But where the offer contains alternative propositions and it is plain to be seen that the acceptance of one of the propositions was within the contemplation of the parties, then it is necessary that the choice be exercised when the offer is accepted where there is a time limit fixed in the contract. See 1 Williston on Contracts, secs. 37 and 45; 7 Amer. & Eng. Ency. of Law (2 Ed.), 125, 138; Stitt v. Huidekoper, 84 U. S., 385, 21 L. Ed., 614; Center v. Center, 38 N. H., 318; Keller v. Ybarru, 3 Cal., 147; Wheeling Steel Co. v. Evans, 97 Md., 305; Parks & Son v. Griffith & Boyd Co., 117 Md., 494; 2 Williston on Sales (2 Ed.), 1174, sec. 464.

This assignment must be sustained.

4. The defendant Coal Company's second assignment of error, to the effect that the Chancellor erred in overruling its demurrer to the bill on the ground that the complainant had not executed and delivered the $20,000 bond within the time required by the option, is well made and should be sustained. The provision about the execution of the bond was a material part of the contract. The complainant was insolvent to the extent of $200,000, which was known to the defendant Coal Company. There was no binding contract until the bond was made as it was a material condition of the offer made to safeguard and protect the Coal Company against loss for coal delivered. If there had been no time limit for acceptance, we think the execution and delivery of the bond before shipment might have been sufficient, but as there was a time limit and the proposition provided that it must be accepted by May 20, 1922, it was incumbent on Armistead to execute and deliver the bond when he accepted the offer.

"The contract in this case consisted, in effect, of an offer on the part of the plaintiffs to purchase 100 bales of cotton, and an acceptance of the offer by the defendant. In the statement of the offer there is contained an obligation upon the party making the offer to give a bond on his part for $5 per bale (which would be $50 for each 100 bales). This offer was accepted generally by the defendant, without stipulation of any condition on his part or the waiver of any condition contained in the offer; and the contract would have been binding upon him immediately upon a compliance with the stipulated condition in the offer that the bond should be given (sent by mail). But we are of the opinion that the stipulation contained in the offer that a bond in compliance with the terms of the contract should be sent by mail was a condition precedent, and that until it was complied with the contract was not binding upon the defendant. While the acceptance of the plaintiff's offer was general in its terms, it secured to the defendant the benefit of all conditions in the offer which might safeguard him in the delivery of the property purchased, as effectually as it brought him under the obligation to perform his undertaking, and one of those safeguards was a bond which would have protected him against loss or diminished his loss in the event the proposed purchasers should refuse or become unable to pay for the cotton after the same had been shipped to them." Batts v. All & Son, 137 Ga., 358.

"Where the contract is really an offer on one side, with a provision that this offer must be assented to and accepted, when a mere acceptance is contemplated, or payment must be made, when payment was the act of acceptance contemplated, at or before a specified date, then, of course, the act of assent or of payment must be done within the prescribed time, and time is, from the very form of the contract, essential. If, therefore, a vendor agrees to convey if payment be made at or before a given date, or if an option is given, which is to be accepted by payment within a given time, then the time of the payment is certainly essential. In fact, payment is a condition precedent to the vesting of any right in the vendee." Pomeroy on Contracts, sec. 387; Rickard v. Taylor, 122 Fed., 931, 936; Waterman v. Banks, 144 U. S., 394, 36 L. Ed., 479.

5. E. L. Hampton's assignment of error that the Chancellor erred in not sustaining his demurrer to the bill because he was not a party to the contract sued on and no cause of action was stated against him in said bill, is not well made for the reason that it was alleged in the amended bill that Hampton was liable if the Company had not authorized him to make the contract. We think this would state a cause of action against him if it should have turned out that he

was not authorized to sign the option and had conspired with his son, Stanlee Hampton, to fraudulently and surreptitiously insert "Clause 9" into the contract without Armistead's knowledge. But our action on this assignment becomes immaterial as there was no proof to sustain the charges against Hampton.

The complainant's assignments of errors having been overruled and the defendant Coal Company's assignments having been sustained, it results that the decree of the Chancellor dismissing the bill must be affirmed. The cost of the cause including the cost of the appeal is adjudged against complainant Armistead, for which execution may issue.

Faw, P. J., and DeWitt, J., concur.